UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martinez-Olguin, District Judge

P2I, LIMITED,                    )
                                 )
          Plaintiff,             )
                                 )
vs.                              )   Case No. C 23-01690-AMO
                                 )
FAVORED TECH USA CORPORATION,    )
et al.,                          )
                                 )
          Defendants.            )
_____)

                                      San Francisco, California
                                      Tuesday, May 6, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
         RECORDING 1:55 - 3:08 = 1 HOUR 13 MINUTES

APPEARANCES:

For Plaintiff:
                              Bochner, PLLC
                              295 Madison Avenue
                              12th Floor
                              New York, New York 10017
                         BY:  ARIEL REINITZ, ESQ.

For Defendants:
                              Perkins Coie, LLP
                              11452 El Camino Real
                              Suite 300
                              San Diego, California 92130
                         BY:  PATRICK J. MCKEEVER, ESQ.

                              Perkins Coie, LLP
                              700 13th Street, NW,
                              Suite 800
                              Washington, D.C. 20005
                         BY:  JONATHAN I. TIETZ, ESQ.

*Echo Reporting, Inc.*

2

Transcribed by:                    Echo Reporting, Inc.
                                   Contracted Court Reporter/
                                   Transcriber
                                   echoreporting@yahoo.com

3

<u>Tuesday, May 6, 2025</u>                                    <u>1:55 p.m.</u>

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Calling Civil Matter 23-1690, P2I, Limited v. Favored Tech USA Corporation, et al.

Counsel, please state your appearances for the record, starting with the Plaintiff.

MR. REINITZ (via Zoom):  Good afternoon, your Honor.  Ariel Reinitz for the Plaintiff.

THE COURT:  Good afternoon.

MR. MCKEEVER (via Zoom):  Good afternoon, your Honor.  Patrick McKeever for Defendants, and with me is my colleague Jonathan Tietz as well.

MR. TIETZ (via Zoom):  Good afternoon, your Honor.

THE COURT:  Good afternoon, Counsel.

Folks, before we launch in today, I just want to -- I want to orient us, and really I may be asking you to orient me a little with regard to the pending motions in this case.

So, you're set today on two of Defendants' motions, the motion for Attorneys' fees in the form of Section 1927 sanctions based on Plaintiff's pleading deficiencies earlier in the case, as well as the motion for judgment on the pleadings related to the purported unpatentability of the '070 patent.

Since those ripened, two more motions have been filed

4

and are still being briefed, Plaintiff's motion for leave to amend the complaint to remove the '087 patent following PTAB's recent invalidation of several of the '087 patent's claims and Defendants' motion for Rule 11 sanctions.

All right.  So, let me note for you all you have hearing dates on those, but I want to flag for you that those are likely to be pushed back because there are motions already ripened that have hearings -- the hearings set later or later than yours presently are set for.  So, they'll be moved back.

I also want to ask, like, my -- from a cursory review, like the motion for Rule 11 sanctions seeks dismissal of the case as well as recovery of attorneys' fees based on alleged bad faith revealed by materials uncovered in discovery.

So, my inclination is to dig into all of the allegations of bad faith on the part of P2I and its counsel at once.  So, I'm actually going to pocket -- I'm going to hold over the hearing on the motion on the Section 1927 claims because I'd rather we just take that all up at once, but I do want to -- and hear that with the Rule -- once you've briefed the Rule 11 sanctions, we can sort of take it up then.  But before -- before I move us onward, I do want to pause and ask if any of you all want to for the record lodge any objections to that -- to that method of proceeding.

5

MR. MCKEEVER:  On behalf of Defendants, your Honor, I think we're okay with that.  You know, we actually were talking the other day and thought that -- you realized that that's maybe an approach that your Honor would take.  And, so, I understand, you know, what you're thinking there, and we're okay with that, addressing all those issues together.

THE COURT:  All right.  Thank you, Mr. McKeever.  Mr. Reinitz, do you have anything you want to say about that before I move us onward?

MR. REINITZ:  Great minds think alike, and I agree too.

THE COURT:  All right.  Wonderful.  We're all on board.  All right.  I'm sure the rest of this won't be quite as, you know, all in the same direction.  We'll see if we keep going in the same direction, but let's -- let's give it a go here.

All right.  So, let's talk then about the motion for judgment on the pleadings related to the patentability of the '070 patent.  All right.  We will go ahead and take that -- we'll do that today, and then you all can, you know, as -- as we decide after you get the order on it how to continue proceeding and what happens with the rest of these motions.

So, my first question, so, I realize you all did a

6

motion to dismiss with me already.  So, you know this.  I'm going to ask you all my questions, and then at some point toward the end if there are things you haven't yet hit on that you want to, you are welcome to do.

Before we jump in, I know that I have -- I have from Defendants -- I got your demonstratives.  I also have Plaintiff's objections to the demonstratives.

Let me say this.  I have not looked -- I did not look exceedingly carefully at the things -- at -- I think Plaintiff's objection notes various things on slides -- or pages 6, 11, 14, and 15.  I mean, for what it's worth, the basic premise that you shouldn't be including things in demonstratives that were not in your papers, I don't think that -- that's fine.  So, you know, I'll grant the objection to the extent it is about my not considering things that weren't in the -- that weren't in the briefing -- in the -- in the papers, right.  It shouldn't be in the demonstratives if it's not part of what we already had.

But, beyond that, you know, you all decide whether or not you want to use your demonstratives after I finish.

And, Mr. Reinitz, if you feel the need as we're going at various points to point out things in the -- in any demonstratives they choose to use, please feel free.

All right.  So, my first question is actually for everybody, which is this, right.  I've got the PTAB decision

from 2021 in which Favored Tech challenged the '070 patent. Help me understand a little bit about that.  Can you all tell me what was in dispute there and how it influences Favor Tech's claim of -- that the '070 patent is invalid?

MR. MCKEEVER:  Sure.  So -- so, your Honor, the -- the IPR proceeding on the '070 patent, that took place before it really started, I think even wrapped up before this case -- this litigation was even filed, if I'm not mistaken.

In that case, what -- what the Petitioners presented was specific prior art references, none of which are references that are mentioned anywhere in the briefing on the -- the 101 motion that's before the Court today, and -- and certain prior art references were presented as invalidating the claims of the '070 patent under Sections 102 or 103.

So, the -- the argument was essentially these particular prior art references invalidate the claims because they're either not -- either they're not novel, they were the same as what was in the prior art or they are just an obvious variation of what was in the prior art.

And, so, that was what was at issue there.  In interparties review proceedings, you're not allowed to raise Section 101 arguments.  You're only allowed to raise prior art, and even the prior art has to be based on, you know,

8

written -- printed publications or prior art patents essentially. So, it's kind of a -- a limited universe of materials that you can use and a limited set of prior -- of invalidity arguments that you can present.

So -- so, at no point in the -- in the IPR proceeding was any argument made that the '070 patent claims were invalid under Section 101. I mean, you can't even make those arguments in those proceedings.

And, so, you know, we -- those proceedings are really a red herring in the context of the motion that's currently before the Court. P2I is sort of taking language from the PTAB's decision out of context to try to suggest that, Oh, well, this is really what the -- the patent is directed to or this is why this is inventive. But we cited a number of cases in our reply brief, in particular, pages seven to eight, your Honor, where that approach has just been rejected over and over and over again by the Federal Circuit and District Courts, including in the Northern District of California.

You know, fundamentally, the problem with the argument that -- that P2I is trying to make and trying to get mileage out of the IPR decisions is that Section 101 is about the eligibility of the patented subject matter, are they trying to claim an abstract idea or not.

Sections 102 and 103, which were at issue in the IPR

9

proceeding is different.  That's about is it new, is it not obvious.  And, so, you know, you can have an abstract idea that's new and yet is -- is still abstract.  And, so, the fact that an abstract idea can be new doesn't mean that it survives under Section 101.  And, again, we have a number of cases in our reply brief at I think again pages seven to eight that make that point.  And, in particular, for example, the Synopsys v. Mentor Graphics case from 2016, literally the quote from the Federal Circuit there:

            "A claim for a new abstract idea is
          still an abstract idea."

     And that is fundamentally the problem with the argument that P2I is trying to make, that because these claims survived under 102 and 013, somehow that makes them immune from attack under Section 101.  That's -- that's not the law.

            THE COURT:  All right.  Thank you, Mr. McKeever.
     Mr. Reinitz, do you want to be heard on that?

            MR. REINITZ:  Just briefly.  I generally at a 30,000 foot level agree with much of what Mr. McKeever said.  The only points I would add are that, while there -- certainly, Section 101, subject matter eligibility is a different analysis than Section 102, 103, novelty and non-obviousness, there is overlap, and I know Federal Circuit decisions have addressed the -- and there is I think

admittedly some confusion as to exactly where Section 101 ends and Section 102 -- excuse me -- and 103 begin, because both of those in the <u>Alice</u> test that I know is at issue in the briefing, there's a discussion let's say at step one about considering the -- I don't want to misspeak, but considering the idea of the claim in the context of the prior art, and on the second step of <u>Alice</u>, at step two, it discussed the idea that whether there's an inventive concept beyond what's well understood, routine and conventional.

Well, neither of those analyses can be conducted in the abstract to consider, well, something is -- was routine obviously needs to take into consideration the prior art. And, likewise, the -- under step two in <u>Alice</u>, there's a discussion of the notion that you can have a -- a combination or an ordered sequence of existing or conventional elements that in turn could be nonconventional.

So, that -- again, the whole analysis regarding what the -- whether there's something inventive in the claims I would say necessarily involves some reference to the prior art, if you will. And, from our perspective, that is where the -- the IPR analysis, which, as Mr. McKeever acknowledges, you know, as he must, that the PTAB ultimately concluded that the claims were patentable under Section 102 and 103, while, it's not necessarily dispositive of the 101 issue, in our view, it certainly is relevant for

11

consideration.

THE COURT:  All right.  I have a question for you, Mr. Reinitz, about the motion for leave to amend, but I'm going to hold it because, as long as we're talking about prior art, I then have a question for Mr. McKeever.

But you -- because Mr. -- Defendants' papers refer extensively to the prior art, and I think my question -- and maybe -- I think I just heard Mr. -- Mr. Reinitz agree.  So, I -- I just want to check this.

I had a question for Defendants about how much I am -- how much I am allowed to, how much I should look to the prior art, and I guess -- well, Mr. Reinitz, since you were the last one talking about prior art, I'm actually going to ask you first, and then I'll ask you to jump in, Mr. McKeever, but it sounds like, Mr. Reinitz, you want me to look at the prior art.  You're telling me that I need to to understand but that I need to do it to put everything into context.

MR. REINITZ:  The prior art is we -- the Plaintiffs -- excuse me -- the Defendants asked for judicial notice.  We don't object and -- haven't and don't object to consideration of that in the context of this motion.

I'll note, because you gave me the floor, that the -- the notice of allowance, which I believe it's -- I don't want to misspeak.  I think it's 116-7, Defendants' Exhibit

12

6, addresses the -- as far as we're concerned, is the most directly on point regarding the significance and the -- the analysis of the prior art, and that's exactly what the -- the patent examiner considered all the references the Plaintiffs -- excuse me -- the Defendants have highlighted and ultimately articulated there -- I mean, it's on page nine.  I can read it into the record, but exactly what the differences are, the patentable inventive differences were between the claim -- claim one of the '070 patent and the references found in the prior art.

        THE COURT:  All right.  And, Mr. McKeever, I guess, help me think about how you would like me -- well, how would you like me to think about the prior art?

        MR. MCKEEVER:  Yeah.  So -- so, your Honor, you know, we -- similar to what Mr. Reinitz had said initially, I mean, we -- we provided a lot of the prior art.  And, again, you know, we're only allowed to use what -- what's in the pleadings and judicial notice.  So, we didn't -- you know, we didn't go off and search for all the prior art in the world and all the prior art we're using in our invalidity contentions.  We limited ourselves just to prior art that's on the face of the patent.  So, you know, this didn't require a whole lot of digging.  This was prior art that came up during the prosecution of the '070 patent.

        And what -- what the prior art shows and -- and,

13

really, this -- there's not a lot that's in dispute, your Honor.  I think it kind of simplifies what you need to look at in the prior art based on kind of, you know, what P2I has disputed and what P2I hasn't disputed, but, I mean, the -- the patent itself, you know, talks about plasma deposition as a process that was already, you know, "quite widely used".  And the patent talks extensively about a particular prior art patent application, the Badyal reference that's cited quite a bit in -- in Defendants' briefs, as I'm sure your Honor has seen.  And -- and, really, you know, everything that's in the claims -- and -- and this -- this is especially relevant at -- at <u>Alice</u> step two, but as Mr. Reinitz mentioned, it's also relevant to some extent at <u>Alice</u> step one in terms of figuring out, well, what is the focus, what's really -- what's the -- what's different about this patent claims than -- than what came before it.  You know, all of this prior art basically shows that, well, plasma deposition was already known.  You know, the patent admits that.  So, you don't even have to really go beyond the patent itself to see that that was already known.

You know, the -- the idea of using low power, that's all over the face of the references that are on the face of the '070 patent.  So, that was also well known.  The reasons for using low power, you don't want to damage the monomer or fragment the monomer.

14

So, all of that is there.  We really presented that prior art to primarily at Alice step two, to show your Honor that aside from the abstract idea of, you know, taking this existing process of plasma deposition and employing it at a commercial scale, scaling it up, mass production, whatever terminology, you know, we want to use, aside from that, there is nothing in these claims that is inventive that could save them.  So, as long as the Court agrees that -- that the claims are -- are directed to an abstract idea at Alice step one, which we -- you know, we think we -- we've shown that.  The patent itself is pretty clear about what's the distinction between the supposed invention and Badyal. It's the chamber size.  The patent specification says that. The prosecution history says that.  The title of the patent talks about a large volume chamber.  That's the focus. That's what -- that's what, you know, Alice step one, that's the focus of the claims, and -- and that's abstract.

So, then you get to Alice step two, and we have to figure out, okay, well, is there something else in these claims that would allow them to be patentable even through they're trying to claim this abstract idea.  And if you look at this prior art, again, just the prior art on the face of the patent -- we're not going, you know, to the ends of the earth looking for prior art -- you can see that there's nothing else in these claims.  Everything that's in these

15

claims is consistent with how plasma deposition has been done for 30 years before they filed their patent application.  Your Honor probably saw in the -- you know, I think in our opening paper we had the figure from the NASA patent.  That's from 1975, 30 years before they filed the '070 patent.  You have -- you know, I can -- I have a slide with -- you know, I could show your Honor if you want me to share my screen, but it's --

THE COURT:  Tell me which slide number it is.  I've flipped through them.

MR. MCKEEVER:  Yeah.  It's on -- it's on slide nine.  And it's the same -- same figure your Honor likely saw in our brief.  But, you know, so, 30 years before they filed this application, you know, here's -- here's the monomer going into, you know, the jar 12.  That's the reaction chamber.  There's a substrate, 28, that's being coded.  There's plasma.  You can see that color orange there.  All of this stuff was -- was already well known, and it's not claimed in -- there's no narrow feature anywhere in these claims that -- that limit this to a particular way of doing this process or a better way of doing this process.  The claims effectively just say even if you're using this process and even if you do it the way Badyal did it and you do it the way NASA or whoever else did it, you better not do it in a big chamber because if you do it in a big chamber,

16

we own that, and you're not going to -- and that would be infringing our patent.

And -- and, so, the -- the prior art is really, you know, in a different case and we didn't know what they were going to dispute, your Honor, in their opposition to -- you know, to this motion, you know, in a lot -- in some of these cases, there's a big dispute about what was -- you know, what was already known and what was routine and conventional and what wasn't.  And, so, we -- we put a lot of that evidence in there so that we were -- you know, we had a strong showing that would be difficult for them to dispute that any of this stuff was -- was unconventional, but they didn't really go there.  They didn't really dispute that this stuff is -- is conventional.  And, so, therefore, I don't think your Honor has to actually dig too -- too deep into the prior art because it's really -- you know, that stuff is not really disputed.  That's not really the -- you know, there's not a factual -- a genuine factual dispute over whether these -- you know, whether plasma deposition was already known, whether low power plasma deposition was already known.

THE COURT:  All right.  Before I pass the -- the mic back to Mr. Reinitz, I want to ask you, Mr. McKeever, just because you brought up step one, right, step one requires some reference to other cases to compare

abstraction.  Of those in your brief, which are the best two?  Which have the best reference points for this theory of abstraction here?

MR. MCKEEVER:  I would say -- you know, I think really the -- the -- you know, the -- the proposition from, you know, BSG Tech on page six of our opening brief, that -- and this -- this comes from Alice itself, right, that:

Fundamental practices long present in our system of commerce are abstract ideas."

And, so -- and that's -- you know, a lot of these cases talk about that.  If you're taking some -- some, you commercial idea that's been around for 100 years and you're trying to, you know, get a patent claim on that, that's not going to cut it, and if you have -- if I could just for a moment, I'll do a slide here if your Honor doesn't mind.

THE COURT:  Which slide?

MR. MCKEEVER:  I am going to -- I'll share my screen if that's okay, but I am going to slide seven.

THE COURT:  Before -- before you do, I want to --

MR. MCKEEVER:  Sure.

THE COURT:  Which -- which slide, because I want to give Mr. Reinitz an opportunity?

MR. MCKEEVER:  Sure.  It's slide seven.  This is -- I don't believe this is one that they objected to.  It's

18

just a -- really a pure demonstrative, the one with the --

THE COURT:  Is this the --

MR. MCKEEVER:  -- oven.

THE COURT:  -- oven?

MR. MCKEEVER:  Yes.

THE COURT:  You don't need to share.  I -- okay.  Go ahead.  I appreciate we're all smiling because I --

MR. REINITZ:  No objection.

THE COURT:  I -- I can't remember, did those come -- those came through Friday, right, because I --

MR. MCKEEVER:  Yes.

THE COURT:  And it was something very joyous on a Friday afternoon.  I'm just flipping through them quickly, and I see the oven, and I'm like, okay.

MR. MCKEEVER:  Yeah.  I mean -- I mean, your Honor, I mean, this is -- this is really apt for -- for what's going on with this patent.  I mean, it's easy to look at -- you know, look at this patent for the first time, and if you haven't heard of plasma deposition, it's like, Oh, my -- you know, Oh, my goodness.

But -- but what's going on with this patent is actually pretty easy.  And, so -- so, the idea for -- for this slide and what we're trying to demonstrate here is -- is, you know, when you need to make more of something, you often need bigger equipment to do it.

19

So, you know, I have a four-year-old son who learned how to make English muffin pizzas in preschool. And, so, now he wants to make those like at least once a week. And, so, if we make English muffin pizzas, you know, and it's just him because nobody else really likes them, we use the toaster oven. But, you know, if we want -- if I want to make a pizza for -- for my entire family -- oh, is this not --

MR. REINITZ:  It is showing.

THE COURT:  Oh, is it not --

MR. MCKEEVER:  Okay.  There it is.

THE COURT:  There you go.

MR. MCKEEVER:  There we go.  So, if I need to make a pizza for -- for my entire family, then I use, you know, a regular gas oven that's in our kitchen.  But, you know, if it's my son's birthday and I -- and we have to bring pizza for his entire preschool class, well, I don't want to sit in front of that oven and have to make, you know, eight pizzas and have to do all that work.  So, I'm going to go to a -- a pizzeria who has, you know, this giant, you know, commercially stacked pizza oven where they can make, you know, I don't know, 10 pizzas at a time at least, something like that.  And, you know, this is not unique to pizza.  It could be -- it could be anything, you know, making -- mixing paint.  I could make, you know, a particular paint color by

mixing a couple of water colors, you know, on a piece of paper or, you know, on a little -- in a little dish.  Again, we could, you know, take all the examples back to four year old things.  But if I want to sell that new color of paint that I made, well, then I might need a big vat, you know.

And, so, a lot of times when you're making more of something, which companies do when they try to commercialize, you need bigger equipment, and you take an existing process and you -- and you scale it up.  This is -- you know, this is what companies have done since the industrial revolution.  Car companies do this.  You know, a cookie company might start out as, you know, someone baking in their -- in their home and their cookies are good and they open a small shop, and then they, you know, open a factory eventually.  And when you -- as you -- you know, you grow in scale, you know, the equipment often gets bigger.  Now, that's really all that's happening with the '070 patent.

The Badyal prior art, which the patent admits produces good coatings -- it says good oil and water-repellant coatings in the -- in the '070 patent, you know, that's -- that's effectively, you know, using the -- the toaster oven.  And P2I wants to say, Well, that's great that Badyal can make good -- you know, can make good pizza in a toaster oven, but you can't make a lot of pizza in a toaster oven.

21

So, we're going to patent making pizza in a big oven.

And you can't do that.  That's -- that's abstract. And, you know, we don't have a -- they've made the point, oh, you don't have a -- you know, a case that's -- you know, they kind of make the point that you don't have a case that's closely factually analogous.  And, your Honor, I -- I -- you know, we admit we don't have a case dealing with plasma deposition.  I'd be surprised if there's another case -- I've never heard of another case besides another case they filed a few years ago involving plasma deposition patents.  I mean, this is -- this is sort of a niche technology area, but that doesn't mean that you get to take an abstract idea, limit it to an existing, you know, already developed technology process and get patent claims on that.

So -- so, little bit of a -- little bit of a --

THE COURT:  Mr. McKeever --

MR. MCKEEVER:  Yes.

THE COURT:  -- let me pause you there because this is a good moment to -- to ask Mr. Reinitz one of the other -- Reinitz one of the other questions that I had kind of related to this, which is, right, to some degree what we're talking about, what I -- I think we're hearing Mr. McKeever say and what I'd like to hear you address, Mr. Reinitz is, right, they're characterizing it as -- as a -- like the patent is mere method claims that reproduce by processes of

22

plasma deposition like on a large -- on a large scale.

So, tell me, Mr. Reinitz, what do they get wrong?

MR. REINITZ:  Sure.  And I know he just took it down, but, you know, I think Mr. McKeever --

THE COURT:  Don't worry.  I got the toasters fresh in my mind.

MR. REINITZ:  No, no, no.  Like I said, I could -- I could work with the -- you know, with the visual in my mind too.  So, you know, I -- as I understand it, you know, the analogy that Mr. McKeever was trying to draw, he said, well, you start with the -- the small toaster oven and then just making -- making it bigger and having a bigger oven, there's nothing inherently inventive about that.  But with that -- and then you get -- you get even bigger, and you have the industrial scale oven.

With that said, the suggestion maybe from the other side of the coin is, well, there couldn't be any invention in the -- in the industrial oven or in the -- the commercial grade oven because the beginning and end of that technology is just taking what -- what existed and just making it bigger, and that I think is a fallacy.  I mean, there are -- and I'm not an engineer.  I struggle enough with this technology.  So, I'm not going to go too far out on a limb with respect to ovens, but I would venture to say that there may well be inventive aspects of, again, whether it's the

industrial grade oven or the -- the intermediate grade oven, that it's not just as simple as taking the toaster, the little -- the little one, and making it bigger.  And that's maybe a good segue because that -- that is exactly what the '070 patent says.  It says, Well, we tried to take the -- the Badyal admittedly known process and just apply it in a -- a larger -- I'm reading directly from -- from column two.

"Initial trials revealed that
replication of the conditions used in
the small scale unit and larger chambers
did not produce satisfactory results."

So, that I think is, from our standpoint, the fallacy of a lot of what underlies the Defendants' arguments is that this absolutely is not just as simple as taking the -- whether it's NASA, whether it's Badyal, the -- the prior known technologies and making them bigger, that actually didn't work, and that's -- that's acknowledged right up front at the beginning of the '070 patent.  It's exactly what the -- the inventor declaration from Inventor Colson addresses as well, and it's ultimately what -- exactly what the examiner pointed to like I mentioned earlier in the notice of allowance and saying, Well, yeah, this is -- this is absolutely not what the -- the prior art did not anticipate this, and there was I would say much more to it as far as the -- the invention goes because there -- it was

24

almost counterintuitive to be able to, well, when you have a larger chamber, like I was alluding to with the -- with the commercial-grade oven, there are things that are going to need to be done differently in order to receive the same results or satisfactory results that someone just operating from the -- the prior art, let's say, the smaller chamber, is not going to be able to accomplish, and that -- that is the underlying invention here.

MR. MCKEEVER:  Your Honor, can I respond to that?

THE COURT:  Well, tell me -- I have one further question for him, and then yes.

So, I guess I'm trying to understand if -- and maybe this is you -- tell me what I have wrong about it, right. Is it -- because I think I hear you saying that it might be the size of the reaction chamber that's so unique.  I guess I'm asking them what is it -- you're telling me, Yes, there is something inventive in having scaled up.  Okay.  What is it?

MR. REINITZ:  Sure.  And -- and, your Honor, I -- I won't go further out on a limb than just to -- again, to highlight the articulation the -- the patent examiner who addressed that exactly.  I'll just read it.  I mean, it's at 116-7, the Defendants put in their papers:

"The recorded prior" --

It's page nine.

25

"The recorded prior arts teach a process of coating a surface with a polymer layer by exposing the surface with a plasma comprising of monomeric unsaturated organic compound in gas form.  However, the recorded prior arts do not teach performing a polymerization process with a power density of .001 to 500 watts per" -- I think it's meters -- "cubic meters in a greater than 0.5 cubic meter chamber."

So, it's that -- I -- I would articulate it almost -- or summarize it as a -- that combination of a defined power density in a defined chamber size.  That, again, I mean, that's -- that's in the record.  The Defendants put it in, and that's exactly what the examiner said is what was inventive beyond what was in the -- all of the references that he or she considered directly.

THE COURT:  Okay.  Go ahead, Mr. McKeever.

MR. MCKEEVER:  So -- so, yeah, I was going to, I mean, kind of ask a similar question to -- to what your Honor asked, but it is what -- what is it in these claims besides using a big chamber that -- that is different?

So, Mr. Reinitz suggested that, Oh, well, you know, we -- you know, the inventors tried to do it in a big chamber,

and it didn't work, and they had to figure out a special way to do it and it required things to be done differently.

What is it in claim one of the '070 patent that is different?  There is nothing.  There is the -- he just pointed to the -- the combination of the -- the chamber size and the -- and the power.

Now, the problem with that, again, he keeps switching. He wants to talk about 102 and 103, your Honor.  He doesn't want to talk about 101.  You can't rely on the abstract idea in order to say that the claim has something inventive.  By definition, the inventive concept has to be something that is not the abstract idea.  So, he keeps saying, Oh, well, the -- the examiner allowed it and the PTAB allowed it because, you know, the prior art didn't show this chamber size or this chamber size in combination with the power, but that -- that doesn't work under Section 101 because you're not allowed to rely on the fact that there's a big chamber to say that these claims are inventive.  That's the abstract idea.

And the other problem, your Honor, with -- with that argument is -- the other problem with that argument is there's no dispute -- and if I can put up slide 10 again. This one wasn't one that was --

THE COURT:  Go ahead.

MR. MCKEEVER:  -- there was a fight about.  But, I

27

mean, this -- this is in -- you know, we pointed this out in the opening brief as well.  So, you know, he talks about the power.  I mean, look at this -- this power range is massive.  It's anything from 1 (Zoom glitch) per cubic meter all the way up to 500 watts (Zoom glitch) meter.  That is not -- you know, a lot of these claims that are at issue in these -- in these Alice cases, especially where a Plaintiff is trying to make the argument that, oh, no, these claims are actually about a specific invention, you know, what the Court kind of looks at is, you know, is this -- how broad is this.  And this, your Honor, is extremely broad.  Not only is it -- is it broad, it blatantly covers what's in the prior art on the face of the patent.  We -- we pointed all these references out.  None of this was disputed, your Honor.  There's no factual dispute that Badyal, for instance, discloses a power density of 85 watts per cubic meter.  Well, that is well within this claimed range of anything from one-one thousandth all the way up to 500 watts per cubic meter, and then you have two other references also on the face of the patent that -- the Christensen reference and the Winther-Jensen reference that have 10 watts per cubic meter.

So, the idea that this massive massive power range that -- that is claimed is somehow inventive, it -- it just -- you know, it flies in the face of what's undisputed, you know, what the undisputed prior art, the judicially noticed

prior art shows.

This -- this range that they claim, this couldn't be the secret sauce because Badyal already had this. So, how -- how can Mr. Reinitz and P2I tell us that, Well, the -- what's genius about the '070 patent is that they took Badyal and they put it in a large chamber, and they figured out how to make it work by using power within this range of anywhere from, you know, essentially zero to 500 when Badyal itself discloses using a power density of 85.

So -- so, that limitation is completely not unconventional. It's not inventive, and -- and even the argument, again, that Mr. Reinitz was trying to make based on the IPR or the -- the notice of allowance during prosecution, he's trying to rely on, you know, the chamber size in addition to this because the chamber size is the abstract -- but the chamber size is the abstract idea. He's not allowed to rely on that for -- he's not allowed to rely on that for Alice step two, and I'll just -- so, that -- that, your Honor, for example, that's at page nine of our opening brief.

Again, the BSG Tech case, the quotes is:

"A claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept to render the claims patent

eligible."

And, you now, the language of the test is a little bit -- you know, there's some -- some odd, you know, verbiage in there and everything, but, you know, the -- it's supposed to be kind of simple.  If the claims are directed to an abstract idea, there needs to be something other than the abstract idea that -- that would justify us allowing them to claim this.  And, so, they can't say, Well, power and a big chamber.  No.  The big chamber, that is the abstract idea. And, so, they can't rely on that.  And they certainly can't rely on the power because the power was on the -- was in all the prior art as well, including Badyal, which they talk about in the -- in the patent specification.

THE COURT:  All right.  Thank you, Mr. McKeever.

I have a handful more questions, mostly -- mostly directed -- and forgive me.  I'm now -- I'm trying to get you all back to where I can see everybody.  There we are -- mostly directed to -- to Mr. Reinitz.

I want to take one step back and -- just to make sure I understand or I want to get your thoughts on how this motion relates to the motion for leave to file an amended complaint.  I just want to understand your thoughts on, right, if I end up granting this motion, does that leave any -- does that leave anything standing under the operative complaint?

30

(No response.)

THE COURT:  That is for you, Mr. Reinitz.

MR. REINITZ:  Oh.  If the Court grants the --

THE COURT:  Motion for judgment on --

MR. REINITZ:  (Zoom glitch.)

THE COURT:  Yes.

MR. REINITZ:  I don't want to go too far out on a limb.  Off the top of my head, I don't think so.

THE COURT:  Okay.  And then on a separate -- again, these are -- these are some -- just some of the bigger picture questions I have, but while the motion for judgment on the pleadings is pending, you move to -- you move for a stay of discovery, but in your opposition, you contend that there are existing factual disputes.  So, can you talk with me a little bit about how those two things play together?  And I keep hearing Mr. McKeever talk about the lack of -- now, mind you, I think he may -- this is -- I'm going to ask you, and then I'll give him a chance if he wants to.  I think he may be saying that -- as we all do.  I think we all talk about no genuine -- no dispute of -- no genuine dispute of material fact, and the truth is we're probably just reaching for Rule 56 unwittingly.

I hear some of it -- I hear some of Mr. McKeever's references to be that there's no -- and I think this is true from our conversation so far -- there are no disputes about

31

the prior art.  Okay.  That -- that seems  unremarkable to me.

But I guess I'm curious from you, Mr. -- I mean, you're welcome to correct me, but, Mr. Reinitz, I think the question I have for you is how you would have me reconcile the fact that you now say that there are factual disputes precluding resolution of this motion in Defendants' favor with the fact that you moved to stay discovery.

MR. REINITZ:  Yeah.  Understood.  I mean, ultimately, as regards this motion, the -- the factual issues I believe we flagged -- and I know it's in our papers -- concern the question, for example, at <u>Alice</u> step two, what -- what is the original routine or conventional that is not the same analysis as prior -- what was or wasn't in an individual prior art reference.  That may well involve, you know, some expert discovery regarding exactly what the state of the art was or what was routine at the given point in time, at the priority date of the patent.

So, that -- as far as I guess the Court sort of intimated, that simply cannot be resolved from our standpoint on the pleadings simply because there's just a -- a limitation regarding what -- what is or isn't -- what the Court can or cannot consider in -- in this posture.

THE COURT:  Well, so, let me ask a different question.  What evidence do I have from you that conflicts,

32

because like up to this moment, I feel like what I've heard is like, yes, you agreed earlier that it's -- that I have Badyal, I have all the things that -- so, where is the disputed fact?  I know you -- you have pointed out in your papers, but I think I'm also trying to understand what evidence, if any, I have from you that actually contravenes or what Defendants have put in front of me because I get the sense that you're both relying on the prior art on some level.

MR. REINITZ:  Well, I think the primary question is not so much -- as the Court noted, I mean, what's in the prior art is in the prior art, and what isn't isn't.  it's -- you know, we would take issue -- I know Mr. McKeever was on this point a minute or two ago -- regarding the articulation of what the abstract idea is.  In other words, the Defendants have, in our view, taken a -- a myopic sort of self-serving considerable liberty with defining, you know, what they -- the idea that this polymerization process is -- like Mr. McKeever was showing us earlier, just like taking a -- a small toaster and making it bigger.  That's, again, where we -- where in our view this really goes off the rails because this is -- and the idea -- I know that the -- in our papers I think we highlighted -- the Defendants mentioned the term I think "commercial".  They say, well, this is just about taking this coating process and making it

33

commercially applicable.  Well, the term "commercial" appears once in the patent.  I think it appears like over a dozen times in -- in the Defendants' brief.  In other words, they -- they make a big deal about that, and where they're going with that is, again, this whole notion that, well, the -- the focus of the claim is really just about mass production, and once you get there, well, then mass production is just this abstract idea.  In our view, that's -- that's also a fallacy.  I don't think there's any -- any support for that.

And, to go back to my point earlier about the potential, let's just say, for inventions in each of those various size ovens, notwithstanding the fact that certainly on some level, yeah, you're taking a known technology and making it bigger.  Well, but -- but there's more to it than that, and that's, in our view, what's going on here as well.

As far as -- to go back to your question, your Honor, regarding the issues of facts, it's -- you know, I guess from where I sit, a big part of this is the Defendants' burden.  In other words, to invalidate, I mean, that would be at any stage, but certainly in this one, their patent has the presumption of validity, and they have to prove it by clear and convincing evidence, and they simply haven't at this stage for any number of reasons in our view, not the least of which is conflicting evidence already in the

34

record, whether it's from a notice of allowance, whether it's from the declaration, whether it's from the patent itself.

But, again, I -- I go back to where I was a minute ago. I think the primary issue is more a dispute regarding (a) Alice step one, whether the -- the Defendants have appropriately identified the focus of the claimed invention. In our view, they simply haven't, claiming that mass production -- this whole patent is just about mass production is, in our view, not a -- not a fair or accurate definition of what the claim is. And then at step two, even if the -- if they have articulated an abstract idea, there is significantly more in the claim, and that -- I know that was in our brief I believe from the CellsDirect case, the idea that even improving an existing technological process, which I think that's difficult for the Defendants to dispute, that's both what the patent examiner found and I think was borne out throughout the -- the disclosure and the claims and the other materials, improving existing technological process, which I think this indisputably, is, is enough to meet Alice step two.  So --

THE COURT:  So, at least part of what I hear Mr. McKeever saying is that some of your improvement was already on the face of the Badyal art.  How -- how would you have me think about that?

MR. REINITZ:  We disagree, of course.  But I think the simplest way to get there is simply that the -- the combination.  In other words, the -- the notice of allowance is, you know, clear I think about at least one thing, and that is, well, this combination of the -- the power density, defined range of power density and a defined chamber size was absolutely not in the prior art and, you know, the Defendants have had several opportunities, including at the PTAB, to -- to show that, and they haven't.  And, so, that -- that combination -- you know, again, I know that's in -- in several of the cases we cited, Alice step two, that that combination of even if we admit for the -- the moment known elements, it is something more -- is significantly more, is inventive and -- and is patentable, and, as far as Alice step two goes, is -- is sufficient.

THE COURT:  Let me ask you one other question while you've got the mic, Mr. Reinitz.  I don't think I -- I'm confident I don't fully understand the argument that dependent claims survive if I find that claim one is not patentable.

So, could you just restate it for me?  How, does --

MR. REINITZ:  Sure.

THE COURT:  -- any of the '070 patent remain if I find claim one unpatentable?

MR. REINITZ:  Sure.  At the risk of using the

36

Defendants' papers, but what  the hey --

THE COURT:  I'm sure they won't mind.

MR. REINITZ:  Yeah, I'm they won't.  Yeah.  What -- what I found interesting actually was just -- just before we got started is I was looking at Defendants -- in their motion -- that's at 116 -- I believe it starts at page eight, towards the bottom, and they kind of wind up here. This is when they're discussing, I believe, Alice step one, and they're trying to present an argument that, Well, the -- like Mr. McKeever I think had addressed earlier, there isn't really much here.  The claim is so broad.  That's just an abstract idea.  I'm looking at the last paragraph on page eight or it's at -- on the ECF pages, it's 15.  And the paragraph begins:

"The Federal Circuit has warned that even a specification full of technical details about a physical invention may, nonetheless, conclude with claims that claim nothing more than a broad long or abstract idea."

And the Defendants in that paragraph -- it continues to page nine -- they highlight any -- several it feels to me almost like a strawman.  They highlight a -- continuing on that paragraph of page eight, the nature of the substrate. They say the specification -- I'm at line 25, the

37

specification focuses on certain monomers and discusses reaction parameters, flow rates, chamber pressures, pulsing sequences.

And then at the top of page nine, they say claim one deliberately admits all these details. So -- in a brazen attempt to monopolize the idea of commercial (Zoom glitch). I think what Mr. McKeever was driving at earlier, this idea that, Well, it's so broad -- and, again, in this context, I'm -- in their brief, they said, well, if the claim would have included some of these details, that would have been better. That wouldn't have been abstract, but -- but it didn't.

And then -- and this is where I'm going with this. I appreciate your bearing with me, your Honor. On page 12, so, in the same brief, when they talk about the dependent claims almost as an afterthought on the last paragraph on page 12, they raise these same issues, and they -- they note almost in passing that, yes, the -- the dependent claims -- I'm in -- let's say line 26 on page 12:

"The dependent claims tack on further conditions to carry out the reaction, including specifying a broad range of plasma zones, minimally -- power densities."

They continue their identifying monomers. Those are

38

all things that, you know, just two pages earlier, as I understood Defendants' argument, they were telling the court if these things would have been in the claims, the claim wouldn't have been abstract.

Well, two -- two pages later, they are almost talking out the other side of their mouth and saying, Well, yeah, they are in the dependent claims, but the Court should disregard them because they don't provide -- provide much more as far as eligibility goes.

I know that was a mouthful, but -- but that's where -- where I guess I would direct the Court to start with in thinking about this. The dependent claims in our view certainly -- as the Defendants started earlier in their briefing -- do provide the details that almost in a strawman context the Defendants argued should and would and maybe could provide eligibility. That's -- that's exactly what they do in our view, and that's -- that's what we were trying to point out in our -- our opposition.

THE COURT: So, maybe -- it may -- then is it -- I'm trying to rephrase it to see if I've -- if I've followed you. The dependent claims are not -- are not dependent in the -- on the -- on claim one in the way that we would normally use that word. Like they're not derivative. Like these are not derivative claims?

MR. REINITZ: Well, they are derivative, but each

of them -- and we can certainly look at them individually -- they add additional details regarding, for example, specific monomers that can be used, the manner at which, you know -- I just want to -- other specific conditions, you know, the gas flow right into the chamber.  All of these things that, again, in -- when they were attacking claim one, the Defendant said, Well, there's none of these -- the specification, right, the patent itself describes all these details, and those details could have -- could have taught me more than just this general abstract idea of mass production, but -- but they're -- they're not in the claim. Well, they are in the dependent claims.  So --

THE COURT:  Okay.  But -- but if I find that the first -- that claim one is unpatentable, the rest -- the rest -- the -- the dependent claims subsequently fail as well, do they not?

MR. REINITZ:  No.  No, we -- no, they would not necessarily for -- for the reason I -- I tried and probably didn't succeed in explaining, and that is that the -- the Defendants -- one of the ways in which they attack claim one is to say, Well, there's just no technical detail in there. That's why it's just so high level and so abstract and it's so broad.  The Defendants make this point several times. They say this is -- this is going to monopolize --

THE COURT:  Okay.  But, Mr. Reinitz, let me tell

40

you what will help me, because I -- I get it.  You disagree with what's in their brief.  Can you give me case -- can you give me a case like where the dependent claim survived after the -- after first -- after the -- I don't know what to call it -- the first claim -- after claim -- if claim one is found unpatentable but the dependent claims are allowed to survive, where is that in the law?

MR. REINITZ:  I'm sure I could each -- what I can tell -- by that I mean, I'm sure I could pull up a -- a case that -- with such a holding.  What I will say more -- more generally is that each claim stands on its own.  In other words, the eligibility or invalidity or same thing with -- with infringement -- each claim is considered as its own -- it's own claim literally.  And, therefore, the fact that one -- one claim is ineligible or invalid does not preclude in this context the dependent claims which add further detail.  The broad claim, again, following Defendants' arguments, could in theory be found invalid because they say this is just so broad it monopolizes this general concept of coating that was known, but that would -- the dependent claim which adds specific monomers, specific duty cycles, all kinds of specifics -- I mean, we can look at them.  There are specific molecular structures in some of them -- that very well could -- could save the eligibility of a dependent claim even if claim one is found invalid.

41

THE COURT:  All right.  Let me ask you, Mr. McKeever, pick it from there.

MR. MCKEEVER:  Yeah.

THE COURT:  Just any other thoughts that you have there.

MR. MCKEEVER:  So -- so, I think, you know, it's -- Mr. Reinitz is making it sound maybe a little more complicated than -- than it usually is in practice.  I mean, the reality is every time there's a 101 motion, the -- the Defendant says that there's a representative claim, right, but that claim one or some other independent claim in the patent is effectively representative of all the claims in the patent and if that one is -- if that one is ineligible, then all the other claims are ineligible for -- for basically the same reasons.

We addressed this in our opening papers at Docket 116 at 12 to 13.  There's the -- the Mobile Acuity case from the Federal Circuit.  It's I think maybe the most recent kind of case that -- that addresses sort of how to deal with this issue of representative claims.  And, you know, essentially what it says is, you know, the Defendant can make this argument that a claim is representative as long as the -- the different claims are related to the same -- you know, related to the same abstract idea and -- and they're substantially similar.  And that's our position.

42

And then, you know, what -- what Mobile Acuity basically says is then it's up to the -- you know, the patentee to rebut that and show that there's something, you know, significantly different in these dependent claims that merits, you know, considering them separately.

You know, our position on that, your Honor, would be, you know, they certainly didn't concede that -- that claim one was representative, but they didn't do a whole lot to -- to argue that these other claims justify different treatment.

If I can respond briefly to -- to Mr. Reinitz' point, we -- I completely stand by, you know, what he was reading from page eight of our -- of our brief that, you know, their patent specification has a whole lot of details in it, and if those details were claimed, he would have a much better argument that this -- that these claims are -- are directed to a specific invention, maybe a -- maybe a specific way of doing plasma deposition in a big chamber.  But they talk about all these details.  They suggest all these details matter, but when it comes down to stake out what they want to own, what they want to claim, all this stuff goes out the window.

Now -- now, Mr. Reinitz is suggesting, Well, but all those details come back in in the dependent claims.  Not really.  If you look at the dependent claims, most of them

43

just pick one -- one thing and -- and add it back.  So, a whole bunch of these claims, including the -- some of the dependent claims they specifically called out in their -- in their brief were about the -- the specific monomer that's used.  And I think Mr. Reinitz even just mentioned that in his -- in his argument.

     The problem is the -- the patent -- and this is in our reply brief.  The patent literally -- the '070 patent literally says the monomer in the '070 patent is the monomer in the Badyal prior art, and we -- and we cited to that.  We cited to where those admissions are, and we also cited to -- we cited like comparisons of where you'll find the exact same thing.  So, for instance, you know, claim -- let me -- let me look at this.  It's at the end of our reply brief.  It's page 12 of Docket 124, you know.  So, we -- we've pointed out, for instance, the compound recited in claim seven -- so, that's one of the dependent claims they're suggesting, you know, maybe that's inventive even if claim one is not allowable.  Well, that -- all that claim adds is a compound that is exactly literally the same as what's in Badyal.  So, like, there's -- there's no possible way they can say this is inventive when the one thing that's added is already -- they're -- they're literally taking it from what they admit is -- is prior art.

     And, so, in the vast majority of these cases, your

44

Honor, the Courts -- you know, especially if it's a -- you know, a decision of, you know, finding ineligibility, the courts say, you know, claim -- whatever the -- whatever the representative claim was was representative, I don't see any significant differences between -- you know, between these claims that would -- you know, that would -- that would alter the 101 analysis, and, you know, therefore, all the claims are -- are treated the same way.

That -- that was on representative claims and sort of where -- where you left off with Mr. Reinitz.  I don't know if --

THE COURT:  These were all of my questions.

MR. MCKEEVER:  Okay.

THE COURT:  These were all of my questions.  So, in fact, give me one second.  I'm confirming, but I think the -- you all have answered all of my questions.  So, I'm happy to give you all a few minutes each -- sorry.  I'm blocking the camera -- give you all a few minutes each to -- to add something.  Anything else that you think we should have spoken about today that we didn't?

MR. MCKEEVER:  Sure.  There are a couple of -- a couple of points he made earlier in responding to your Honor's questions that I would just want to briefly touch on if I could.

THE COURT:  Okay.

45

MR. MCKEEVER:  I mean, I didn't hear a real clear answer about what the factual disputes are at -- at <u>Alice</u> step two.  Again, they -- they haven't disputed our showing that all this prior art on the face of the patent, you know, discloses plasma deposition, discloses low power, discloses pulsing, discloses all the -- you know, all this stuff.  There's not -- they haven't raised an issue about that.

They've -- you know, and, so, they've suggested that, Well, you know, we can't resolve this on the pleadings because there's an underlying factual issue, but that's -- that's wrong, your Honor.  That can't be right.  Otherwise, you would never resolve 101 on the pleadings.  But the reality is 101 is resolved on the pleadings pretty -- pretty routinely.  And -- and we cited a case in our reply brief at page 11, which was an ND Cal case, <u>Receivership of Audience Science v. Google</u> where they -- the Court shot down this type of argument.  This was a Judge Davila decision where, you know, it was said that you -- basically you can't just say, you know, there's a fact issue and, therefore, we can't resolve this.  It's -- you know, it's a dispositive motion.  It's put up or shut up time.  Like if you have an argument, what's your argument.  What's the -- what's the fact issue that you're going to be able to present evidence on, and we -- we haven't heard any of that.  In fact, Mr. Reinitz kind of pivoted to <u>Alice</u> step one in response to your question.

46

And, you know, Alice step one isn't usually regarded as -- as involving, you know, factual issues. It's really largely a legal issue, what's the claim -- what's the focus of the claim. And, so -- so, I wanted to point that out.

And he -- he circled back again to sort of, you know, what's the evidence that's creating the factual dispute. Again, he points to the notice of allowance. And, you know, there -- and he says there's no dispute that, you know, the prior art didn't show the combination of the low power and the chamber size.

But, again, your Honor -- and we've made -- I've made this point already, and it's in our -- both of our briefs. You cannot rely on the abstract idea to supply the inventive concept. That's perhaps the most clear thing you can find in the Alice case law.

When it -- when it comes to step two, you're not allowed to rely on the thing that the claim -- you know, the abstract idea that was identified at step one. By definition, what the Alice court said, what the Supreme Court said in that case is, You have to show me something else, something else other than the abstract idea that's in this claim that justifies allowing you to patent it, and they can't do that. They keep talking about, Well, the big chamber -- you know, the big chamber wasn't shown. We didn't show that in the prior art. It doesn't matter.

47

That's irrelevant to 101 and certainly irrelevant to -- to Alice step two.

One last quick point I wanted to make. Mr. Reinitz referenced the CellsDirect case, suggesting that the '070 patent claims improve an existing technological process. Your Honor, they don't. They don't improve anything. The coating isn't any different. It's not a better coating. Nothing in the patent suggests the coating is better. The patent -- the '070 patent admits that the coating Badyal produces is a good oil and water-repellant coating. Nothing in the '070 patent says the coating that you get from -- from following the claims is different or better than Badyal.

So, there's no improvement to the technological process. What he's saying is the improvement is I guess you can coat more stuff. But that's -- that's the abstract idea. You know, again, I can make more pizza if I go to the -- the local pizzeria and use their big ovens. But that's not -- you know, that's not coming from a technological invention. That's -- that's coming from the abstract idea. And, so, you know, the CellsDirect case is -- is not on point for -- for a number of reasons, but that's the -- that's the main one that I would highlight.

And I think with that, your Honor, those are the -- those are the last points I was really hoping to touch on.

48

THE COURT:  All right.  Thank you, Mr. McKeever.

Mr. Reinitz, do you want the last word on any of these things?

MR. REINITZ:  Sure.  Just briefly on one point.  I think Mr. McKeever mentioned this earlier, and I think I -- I know we don't have a court reporter right here and now.  So, I don't want to go too far out on a limb, but I think I heard him say just again that the -- or to be effective, the chamber size is -- is the abstract idea.

I mean, to us -- and I think we highlighted it in our brief -- that in my mind is almost a non sequitur.  I don't know -- you know, we're talking about a -- a real world, you know, chamber with, you know, other tubing and gas being pumped in and polymers, and the suggestion that the chamber size -- the well defined chamber size in this -- in the context of this claim together with its other components can just be ignored because it's "an abstract idea", which as I understand the Defendants to claim, it is the -- the abstract idea of mass production.  Again, I don't think that's supported at all by any of the case law.  We highlighted this in our brief.  So, I don't want to belabor it, but I do believe it would be unprecedented for -- to -- to find a claim like this invalid as an abstract idea.  We noted I think in -- in a footnote perhaps, but there are other claims, method of treatment claims, diagnostic claims

49

that have been invalidated under Section 101 as laws of nature or natural phenomena.  Those are other exceptions.  The Defendants have not argued that  They very carefully argued only that this is an abstract idea.  And, as we highlighted, I would go so far as to say just about all, if not all of the cases certainly the Federal Circuit has considered, when they are invalidating claims, patent claims, those are almost always I would say software based processes.  The Defendants quibble with us.  They say, Well, here's a case about a digital camera, and here's a case about a charging -- a vehicle charging port.  But each of those involve -- the digital camera one I think is a good example.  It was a -- a method -- a software method for process -- the digital camera was processing the images.  IT was taking two pictures and then comparing the two, and that's -- I believe it's the Yu case, Apple v. Yu or Yu v. Apple, where the Federal Circuit said, Well, yeah, the underlying invention here is just the processing of the -- processing image in relation to another, which, again, that's a -- a software application.

I -- I do believe that this -- you know, holding a claim like this invalid where there's no software, there's no suggestion, there's not even a whiff of it in the specification, would be unprecedented, and that I know we highlighted it in our brief is, as we understand, exactly

50

what the Federal Circuit said just, you know, a couple of months ago in the U.S. Synthetic case where it said, Hey, you're going too far -- there was the -- I believe it was the ITC went too far out on a limb to invalidate a patent claim that had nothing to do with software.  The case is -- the Federal Circuit said the cases primarily relying on systems that are abstract ideas are using generic computer components, and the claim is directed to some sort of a software application.

There's no software here.  There's no suggestion of a software here.  The Defendants have never suggested that there is, nor could they, that there's software involved, and finding a claim like this invalid as an abstract idea, in my view, would be --

THE COURT:  Mr. Reinitz, can I -- can I ask you to put a finer point on that because you keep saying a claim like this, a case like this and -- but what I hear you saying essentially is because it's not -- it doesn't relate to software.

Am I wrong about that?  Because that's the only distinction I really hear you drawing, right?  It's a claim like this is one not involving software?

MR. MCKEEVER:  It is right in the sense that both Alice and I would say just about all of the Federal Circuit's subsequent decisions that have invalidated cases

-- patents as being directed to abstract ideas, I believe just about all if not all the underlying abstract idea is a software -- is one that is implemented by software.

And then I think if you look at -- the Defendants I think in the reply tried to cite -- there is the garage door case. I don't want to misspeak. There is a case about, like I mentioned, a digital camera. There was the connected -- network connected charging ports. I think each of those to a tee, if you actually look at the -- the facts and the claim that they -- the Federal Circuit was considering when they invalidated it, those were all technologies that involved software, and that was exactly what the Federal Circuit found. Yes, this is a generic digital camera, and you're implementing some kind of a new image processing software on it. You're implementing a network -- a notification transmission technology or a database analysis technology. None of them I think to a tee would be -- and by a claim like this, I'm referring to a chemical process like the one that's claimed here, which, as far as we're concerned, is apples and oranges, and neither <u>Alice</u> nor any of the subsequent Federal Circuit cases invalidating claims as being directed to abstract ideas are a fit for this one.

THE COURT: Mr. McKeever, just on that last point, just so I can hear from you on it as well.

MR. MCKEEVER: There's no -- there's no shortcuts

52

in the law, your Honor.  There's no -- there's no -- if there was a case -- if there was a case that said 101 only -- you know, only applies to software, they would have cited it.  All of these cases that -- you know, including, you know, ChargePoint, which is the network connected vehicle charging stations, you know, Yu was the digital camera case. There was a voting equipment case.  There's a whole bunch of these cases where, you know, it -- it's not based on software.  The -- we went through what the -- the two steps of the Alice framework are.

Now, for sure, has it often been applied to software? Yeah, because probably, as your Honor has -- has experienced already, there's a whole lot of patent litigation involving software.  There's not a lot of patent litigation involving plasma deposition patents and some of these other things.

But that -- you know, the application of -- of the framework is the same.  I mean, it's -- it's about abstract ideas.  It's about these exceptions of things that you're not allowed to patent, and there's -- the idea behind it is these are the building blocks of innovation.  You're not allowed to, you know, take an idea and -- and patent it and block other people from doing it, and that's what's going on with the '070 patent.  They have this idea of, Well, plasma deposition's great, but in order to make -- you know, to use it on a commercial sale, you need to use it -- you know, you

53

need a big chamber.  And, so, if we patent that, you know, we'll -- we'll corner the market, and nobody else will be able to coat, you know, a whole lot of devices on a commercial scale.  And -- and, so, that's -- that's what they've done here, and there's nothing -- yeah, there's nothing in -- in the <u>Alice</u> framework, either step, that makes it limited to -- to software.

     And the, you know, <u>U.S. Synthetic</u> case, as we've said in our brief, I mean, it completely off the -- nowhere close to this.  This is a method claim, your Honor.  These are method claims.  <u>U.S. Synthetic</u> is about a composition of matter of, you know, like claiming a particular material that was created and had certain specific magnetic properties.  There's nothing in these claims about what the result -- resulting coating is or is like or, again, is any different than what was in the prior art.  You know, there's -- there's nothing new about it.  So -- so, that case isn't -- isn't relevant either.  Yeah, there's certainly nothing -- nothing that limits 101 to software, and I can see why they would -- they would like you to look at it that way, but that's -- that's not the law, your Honor.

          THE COURT:  All right.  Counsel, I thank you all. Last words from anyone on anything, but I'll take it under submission and get back to you all on it, and you'll see, just as I flagged while we spoke earlier, you'll see clerk's

54

notices sort of figuring out where to land you all with the other motions, and you'll see the -- the attorneys' fees motions reset at the same time as the Rule 11.

But anything else before -- before we call it a day -- or I -- well, we call it a day with each other.  I'm sure nobody's done.

MR. MCKEEVER:  Nothing from Defendants, your Honor.  Appreciate your time.

THE COURT:  Of course.

Mr. Reinitz?

MR. REINITZ:  Likewise, your Honor.  Thank you.

THE COURT:  All right.  Thank you all.  Have a good afternoon.

MR. MCKEEVER:  you too.

(Proceedings adjourned at 3:08 p.m.)

CERTIFICATE OF TRANSCRIBER


     I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

     I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

          Echo Reporting, Inc., Transcriber

               Monday, October 6, 2025